127 S.W.3d 371 (2004)
In the Interest of S.T., O.T.H., G.T.H., and M.L.T.
No. 09-02-415 CV.
Court of Appeals of Texas, Beaumont.
Submitted December 12, 2003.
Decided February 5, 2004.
*373 Stephen C. Howard, Law Offices of Stephan C. Howard, Orange, for appellant.
C. Ed Davis, Texas Dept. of Protective and Regulatory Services, Lana Shadwick, Special Litigation Unit-Appellate Section, Houston, for appellees.
Before McKEITHEN, C.J., BURGESS and DAVID B. GAULTNEY, JJ.

OPINION
DAVID B. GAULTNEY, Justice.
This is a parental rights termination case. The Texas Department of Protective and Regulatory Services[1] sought termination of appellant's parent-child relationship with his four children on two grounds: (1) endangerment by conditions or surroundings; and (2) conduct endangerment. See Tex. Fam.Code Ann. § 161.001(1)(D) & (E) (Vernon 2002). The jury returned a verdict that the parental rights of both parents as to all four of their children should be terminated. The father, Onesimo Herrera-Trejo, Sr., appeals from the trial court's order of termination.
A court may order involuntary termination if the court finds (1) a parent has committed one of a statutory list of acts or omissions, and (2) termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). The trial court's findings must be based on clear and convincing evidence. Id.; In re B.L.D., 113 S.W.3d 340, 353-54 (Tex.2003). In issues one through six, appellant challenges the sufficiency of the evidence to support the jury's findings. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. See In re J.F.C., 96 S.W.3d 256, 265-66 (Tex.2002) (defining the standard of review for legal sufficiency); In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (defining the standard of review for factual sufficiency).
When reviewing the legal sufficiency of the evidence, an appellate court looks at the evidence in the light most favorable to the finding. In re J.F.C., 96 S.W.3d at 266. In the "clear and convincing" context, this means we must assume that the factfinder resolved disputed facts in favor of the finding, if a reasonable factfinder could do so. Id. We must disregard all evidence that a reasonable factfinder could have disbelieved or found incredible, but undisputed facts cannot be disregarded. Id.
When reviewing the factual sufficiency of the evidence, we must give due consideration to any evidence the factfinder could reasonably have found to be clear and convincing. Id. The evidence is factually insufficient if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." Id.
In the instant case, the jury was instructed in answering the termination question that, in order to terminate appellant's parental rights, "it must be proven by clear and convincing evidence that termination is in the best interest of each child and that at least one of the following events has occurred[.]" The provisions of *374 sections 161.001(1)(D) & (E) of the Texas Family Code were then reproduced for the jury, as the jury was asked to determine whether appellant did the following:
knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; [Section 161.001(1)(D), Texas Family Code]
engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children [Section 161.001(1)(E), Texas Family Code].
The Department's involvement with appellant and his family began June 16, 1998, and continued to the time of trial, August 19, 2002. A number of Department personnel were called to testify as to their personal experiences with appellant, his wife Barbara, and the children.[2] Also testifying were witnesses from law enforcement, day-care personnel, a non-governmental human services case-worker, various foster parents in whose homes the children were placed over the years, a case-worker for Adult Protective Services, and the Court Appointed Special Advocate (CASA) volunteer. Through these witnesses, the Department showed the plight of the children essentially stemmed from Barbara's physical and mental inability to care for the young children,[3] and from appellant's neglect of the children.
At the time of trial, the children had been removed from the home and returned twice, with a third and final removal taking place on July 27, 2001. Only three months following the birth of the third child, G.T.H., the children were removed from the home on September 3, 1998, because the two boys, S.T. and O.T.H., were found playing on a roadway that ran next to their home. The roadway had a posted speed limit of fifty miles per hour. When law enforcement officers arrived at the location, they were initially unable to get anyone to respond at the Trejo home. The officers entered the home and observed Barbara asleep on a mattress. Because of the way she spoke and moved, she was thought to be intoxicated. However, upon speaking with her further, an officer determined she was not intoxicated, but was "slow," and had difficulty in understanding the danger to the children of playing in the roadway.
The Department's caseworker investigating this incident concluded there was reason to believe the Trejo children were physically neglected by Barbara. Essentially, the children were in a home environment that presented health and safety hazards. In September 1998, the primary goal of the Department, working with Barbara and appellant, was to have someone in the home with Barbara to assist in caring for the children. At that time, Barbara was still ambulatory, though she had to drag her left leg slightly when walking. Her speech was slow, but understandable. She had limited learning ability. Based upon observations of Barbara and her limited cognitive abilities, concern arose about the children's speech being delayed. Barbara would not talk to them enough. The youngest boy, O.T.H., was assessed for developmental problems when he was two years old as he was not speaking and he was not acting as if he understood what *375 was being said to him. The oldest boy, S.T., who was almost three years old at the time of the Department's first intervention in September 1998, exhibited abnormal and prolonged aggressive behavior. When S.T. behaved this way, Barbara would have no control over him. She would usually smile and make no attempt to stop S.T. or give him any directives.
At all of the places where the Trejo family resided during the four-year period of Department assistance and intervention, the sanitary conditions were bad. The record contains testimony of severe roach infestation from virtually every witness who entered any of the Trejo residences.
Testimony was elicited from various personnel at Winnsong Daycare. Winnsong was involved with the Trejo children beginning on December 10, 1998, when S.T. began attending, through March 28, 2001, when the three older children stopped attending. A daycare employee would come to the Trejo home and pick the children up, and then return the children to the home in the afternoon. The director of Winnsong testified that throughout her experience with the Trejo family and children, the children were usually "filthy" when picked up from the home. If the children had already been bathed when the daycare driver arrived to pick them up, they were usually not dressed and had to be dressed by the daycare personnel before being placed in the van. The director estimated that seventy-five percent of the time the children needed bathing upon arrival at the daycare.
The director also witnessed the deteriorating physical condition of Barbara during the three years the daycare was involved with the children. In March 2001, when the daycare ended its services to the Trejo children, Barbara was having trouble walking, she could not keep up with the boys, and the boys were becoming more aggressive toward her to the point of pushing and hitting her.
The daycare director further stated that when S.T. began daycare at age three, he would use language inappropriate for a three year old. He would use this foul language in any context, and specifically if he became angry at a teacher. When O.T.H. began daycare at age two, he was difficult to evaluate because he would not talk. He would drag one leg, like his mother, and would not run. He preferred to sit and watch other children rather than interact with them. He was able to progress after several months of attendance at the daycare.
Shortly before March 2001, when Department funding for the Trejo children to attend Winnsong would end, the Department requested that the director compose a letter providing input for aiding Department personnel in making a decision concerning the children. Portions of the letter were read to the jury and it was admitted into evidence as Petitioner's Exhibit 2. In part, it reads as follows:
We have many concerns regarding the welfare of the [Trejo] children when left in the constant care of their Mother, Barbara. Her health, mental as well as physical, will not allow her to manage three very active and sometimes difficult young children. [S.T.] has exhibited anger toward his mother. We have witnessed both boys hitting her and running toward the road, she cannot chase them so she ignores the behavior instead of correcting him [sic]. Many times we have gone to get the children and they have been naked running around in the house when we get there. Barbara will say that she can't make them get dressed or get their shoes on. These are 2 and 4 year old children.... If she can't make them get dressed how can she stop them from getting into things *376 that will harm them? We have to bathe the children on a regular basis because they are so dirty when they get here that we cannot cuddle them until they have a bath.... If care is dropped for these children [S.T.] will be riding the school bus home. The bus stops a block away from the house. Barbara will have to walk to the bus stop with [O.T.H.] and [G.T.H.] to pick up [S.T.]. She will not be able to control the children and that situation is an accident waiting to happen. Her judgment is sometimes very bad regarding her children. She as [sic] stopped the car on the opposite side of the street from our Daycare and let [O.T.H.] and [G.T.H.] out. They started to cross the street before we could get to them (Thank God a car was not coming).
Some other things we have witnessed when we have gone to pick them up have been:
....
The kids running up to us when we get there with an unopened can of beer.
[O.T.H.] and [S.T.] grabbing hot food off the stove next to a pan of hot grease.
There [sic] home is filthy at times. Broken glass outside the door where the children play.
....
We feel the children deserve an atmosphere in which they are cared for properly, loved, happy, and have an opportunity to learn and grow....
We understand that this is a difficult case. Both parents love their children and would not intentionally hurt them. However we do not feel that Barbara can care for them at this stage and age of their lives.
The record reflects that until the last removal of the children on July 27, 2001, the goal of the Department was reunification of the children with their parents. However, on September 27, 2001, the date for a scheduled court hearing to review placement of the children, the Department made the decision to cease attempts at reunification, and to seek termination of parental rights. Thereafter, in October 2001, Department personnel learned Barbara was again pregnant. Barbara was wheelchair-bound, and had suffered a stroke during the delivery of her last child, G.T.H. The fourth child, M.L.T., was born January 3, 2002, and immediately placed in foster care following her discharge from the hospital. It is undisputed that neither Barbara nor appellant ever had custody of M.L.T.
The ultimate decision to seek termination of parental rights came only after the children had been returned to Barbara and appellant on July 17, 2001. The children had been returned under the strict condition that the children were never to be alone in the home with Barbara. A responsible adult capable of taking care of the children was to be present. This condition was found to have been violated only ten days later, when a Department caseworker arrived at the home and the children were alone with Barbara. The caseworker says when she questioned Barbara as to the whereabouts of the designated responsible adult, Barbara's father,[4] Barbara misled her by saying her father was at the store. The caseworker noted that the children were wearing very dirty clothes, and the house was in a dirty condition. She was concerned whether the children had eaten. The caseworker telephoned *377 Mr. Fontenot's home and he answered and told her he had left Barbara's house because he had a headache. With no other reliable adult in the picture, the Department removed the children for the final time on July 27, 2001.
Testimony was elicited from a foster care case manager for the Department, Alysa Elliott-Wilson. During questioning from the attorney ad litem for the children, the following exchange took place:
Q. [Attorney ad litem] Okay. And as far as Ms. Herrera is concerned, there's been testimony by you and other people today and in the preceding days that her condition has deteriorated since thisin the past four years?
A.[Elliott-Wilson] Yes.
Q. And I think you mentioned earlier that she can't care for herself, much less for her children?
A. No, she cannot.
Q. Can you give us some specifics aboutsome examples of how she cannot care for herself? Is she able to walk?
A. As I indicated earlier, there are times that she has come to our office for visits and she almost fell down several times. I have had to put her in a chair with wheels on it in our office and roll her out.
And as bad as this may sound even at the beginning of this hearing, I took her to the bathroom and I had to pull up her pants and her underwear because she couldn't get them up.
Q. In other words
A. I had to help her wash her hands.
Q. she can'tshe has no use of her body?
A. She could not do it. I had to help her do those things, yes.
Q. So by that, is there any way she could change a diaper on a baby?
A. She can't. She can't hold [M.L.T.] when I put her in her hands.
Q. She could not hold her baby. She couldn't change the diaper. Could she give her baby a bath?
A. No, ma'am.
Q. Could she prepare food for her baby?
A. No, ma'am.
Q. Would it have been irresponsible on CPS' part to have allowed that baby, that newborn baby to go home to this mother?
A. Absolutely.
Q. And based on the experiences with the other three children, did you know with a certainty that she could not care for this baby?
A. Yes.
Q. And that is why CPS chose to remove the baby from the hospital?
A. Yes, ma'am.
Most of the Department's involvement with the Trejo family centered on personal contact with Barbara and the children. Contact with appellant was minimal. Nevertheless, appellant does not dispute the fact that he was aware of Barbara's condition, and the fact that her condition deteriorated over the years in question. He testified that he watched Barbara's condition get worse, and that her worsening condition began after the birth of G.T.H. Appellant also understood it was his responsibility to make sure his children were in a safe place, whether or not he was at work. When asked if Barbara could care for the children without help, appellant at first replied that he did not know. When pressed to answer the question again, he replied that, "She can do it sometimes." The Department's attorney asked him if he felt perfectly comfortable going to work and leaving his children solely in Barbara's *378 care in her present condition, and appellant replied "Yes."
However, the record also contains testimony from Department personnel that appellant had commented Barbara's "abilities seemed to be getting slower all the time," and that following the March 19, 2001, second removal of the children, appellant admitted he understood Barbara could not care for the children by herself. Testimony also indicated that when appellant and Barbara asked the Department supervisor what they could do to have the children returned, appellant was informed that if he could get one or several people to come into the home to help Barbara care for the children, there was a possibility that the judge would return the children to the home. This resulted in the unsuccessful attempt to have Mr. Fontenot be the children's caregiver. The record seems clear appellant was aware of the dangers of leaving the children alone with Barbara and the fact that the Department required one or more people in the home to care for the children when Barbara was alone.
At the time of trial, appellant was in custody on a hold issued by the Immigration and Naturalization Service, and facing imminent deportation. Appellant had never attempted to rectify his status.
"Endanger" means to expose to loss or injury, to jeopardize. In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the children or that the children actually suffer injury. Id. Appellant argues that "the evidence shows that the children were healthy and normal," and that the evidence was legally and factually insufficient to prove their physical and emotional well-being was endangered. However, whether a child has yet suffered actual injuries is not dispositive of the endangerment issue. Despite appellant's responses to the contrary, the evidence is overwhelming that Barbara was not able to take care of the children. By continuing to leave his young children essentially on their own, knowing Barbara could not take care of the children or protect the children from exposure to dangerous conditions in and around the home, appellant knowingly allowed the children to remain in conditions and surroundings that endangered them.
Appellant's youngest child, M.L.T., was never in the custody of either appellant or Barbara following the child's release from the hospital. We have considered a similar factual situation in which a child less than a week old and in respondent's custody only a few days, was placed with Child Protective Services. See In the Interest of B.B., 971 S.W.2d 160, 164 (Tex.App.-Beaumont 1998, pet. denied), disapproved on other grounds, In re C.H., 89 S.W.3d 17, 26 (Tex.2002). Although we sustained a point of error in that case alleging legal and factual insufficiency of the evidence to support termination of parental rights of the child under the Department's "endangerment by conditions or surroundings" allegations, we did examine whether the termination finding could be sustained on evidence that the respondent-parent engaged in conduct which endangered the child's physical or emotional well-being. Id. at 169. We follow that approach here.
Again, to "endanger" a child for purposes of the statutory termination provisions, the parent's acts or omissions in question need not be directed at the child and the child need not have yet suffered injury. Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). If the evidence shows a course of conduct which has the effect of endangering the physical or emotional well-being of the *379 child, a finding under section 161.001(1)(E) is supportable. Id. at 534. In the instant case, the jury heard evidence of appellant's continued neglect to provide a safe home environment for the children, as well as of appellant's two prior convictions for Driving While Intoxicated, and of his continued drinking to intoxication even though he was aware of risk to his children. Barbara could not take care of M.L.T., and the child would be left unattended in her care upon her release from the hospital and subject to the same environment as the other children. The evidence is legally and factually sufficient to support a finding that appellant engaged in conduct that endangered the physical and emotional well-being of M.L.T., as well as that of his other three children. See generally In re K.M.M., 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.); In re J.N.R., 982 S.W.2d 137, 142-43 (Tex.App.-Houston [1st Dist.] 1998, no pet.), overruled on other grounds, In re C.H., 89 S.W.3d 17, 26 (Tex.2002).
The record includes legally and factually sufficient evidence to support the best interest requirement of section 161.001(2). In determining a child's best interest, a jury may consider the current and future physical and emotional needs of the child, the current and future physical and emotional danger the child may confront with the parent, and the parental abilities of the individual seeking custody. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976) (setting out list of nonexclusive factors to consider when determining best interest of the child). The current and future needs of the children include being provided with a safe, stable, clean, and nurturing home environment. O.T.H. was diagnosed as having cerebral palsy and has special needs. At the time of trial, evidence was presented of a family already certified by the Department interested in adopting all four children. A Department caseworker stated that the children would be placed with a family so as to provide for their continued health, safety, mental, and emotional needs. When in foster care, the children seemed to thrive. We conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of the four children.
Appellant says in issue seven that because the evidence was legally and factually insufficient to support the verdict on one or both of the two submitted grounds, the trial court erred in submitting a single, broad-form question. We note this issue was properly preserved and ably argued by counsel. Appellant's objection was overruled. The trial court submitted a single "Yes/No" termination question for each child. We have concluded the evidence is legally and factually sufficient to support either ground for termination as to S.T., O.T.H., and G.T.H. Our review of issue seven is focused on the termination of appellant's rights as to the infant, M.L.T., because M.L.T. was removed from appellant's care on her release from the hospital and so was not "placed" or "allowed" to remain in the environment the other three children lived in for the prior four years. See Tex. Fam.Code Ann. § 161.001(1)(D).
Citing Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex.2000), appellant contends that when a trial court submits a single, broad-form question incorporating multiple grounds, including both valid and invalid theories, and objection to the charge is properly presented, the error is harmful and a new trial is required, because an appellate court cannot determine under those circumstances whether the jury based its verdict on the improperly submitted ground. The Department responds that Casteel involved the mixing of invalid and valid legal theories in the jury charge, and here two valid grounds for *380 termination were submitted. The Department also argues that Harris County v. Smith, 96 S.W.3d 230 (Tex.2002) involved the submission of a "damage" element lacking evidentiary support, not a "theory of liability," and is inapplicable to the circumstances in the instant case. The Department relies on the Supreme Court's decision in Texas Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990). In E.B., the Supreme Court approved a broad-form submission substantially the same as the jury question and instructions here. The sufficiency of the evidence was not at issue in E.B.
In Harris County v. Smith the Supreme Court held that because an element of damage had no support in the evidence, its submission, along with valid damage elements, resulted in an erroneous jury charge. Id., 96 S.W.3d at 232. The Court also held that the charge error was harmful, because the appellate court was prevented from determining whether the jury based its verdict on the improperly submitted element of damage. Id. at 234 (citing Casteel, 22 S.W.3d at 388). The significance to our case of the Harris County v. Smith holding is that the Court applied Casteel harm analysis to a broad-form submission which was erroneous because an element submitted had no support in the evidence. Harris County v. Smith, 96 S.W.3d at 231-32. The problem addressed in Harris County v. Smith is a potential difficulty to be avoided in any broad-form submission, including the type of submission approved in E.B. and at issue here. We are not entirely persuaded, however, that an instruction in a parental rights termination case that tracks the statute, and tells the jury that at least one of the grounds for termination must be proven by clear and convincing evidence, necessarily suffers from the same no evidence, harmful error infirmity as the instruction in Harris County v. Smith, when the termination grounds are so closely related as here and the ultimate fact inquiry is the same.[5]
Even assuming the trial court should have limited either the predicate instructions or the broad-form question as to M.L.T. to section 161.001(1)(E) conduct by appellant, we do not believe the inclusion of the instruction on section 161.001(1)(D) as to M.L.T. requires reversal. Rule 44.1 of the Texas Rules of Appellate Procedure provides that "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals." In Casteel, the Court noted that charge error in submitting an invalid theory may be harmless if the "questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory[.]" 22 S.W.3d at 389.
The gravamen of the two statutory allegations submitted to the jury were virtually identical: "knowingly" committing acts or omissions which ultimately "endangered the physical or emotional well-being" of the children. The same evidence was used as proof of appellant's violation of both *381 statutory provisions. The evidence focused on the many deficiencies in appellant's conduct during the course of four years, and demonstrated the serious physical and emotional dangers the children faced if the neglect was permitted to continue. The two adult caregivers responsible for the children's physical and emotional well-being, Barbara and appellant, did not take care of the young children. Rather than appellant's accepting responsibility, he neglected to provide a safe, secure, and clean home environment for the children. Through his neglect the children were endangered. M.L.T.'s well-being was endangered on her pending release from the hospital. To find harm resulting from the inclusion of (D) in the M.L.T. jury instructions, we would have to first conclude a possibility exists the jury could have based its answer on (D) and not (E), despite the jury's hearing the same evidence applicable to both sections. That the jury based its answer on (D) and did not find (E) does not seem a possibility under the circumstances in this case.
In E.B., the Supreme Court stated, "The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under § 15.02 the jury relied on to answer affirmatively the questions posed. All ten jurors agree that the mother had endangered the child by doing one or the other of the things listed in § 15.02 [now 161.001]." E.B., 802 S.W.2d at 649. The controlling question in this case is whether the appellant's relationship should be terminated because his conduct endangered the child. We conclude the jury verdict was based on a ground for termination supported by the evidence and the law. Issues one through seven are overruled.
The final two issues, eight and nine, complain of error by the trial court in denying motions for mistrial on two separate occasions during trial. In one instance, the witness's nonresponsive answer informed the jury of a prior hearing on a motion by appellant's counsel to withdraw from the case. The record reflects counsel immediately objected, and requested that the court instruct the jury to disregard the comment. The court sustained the objection and instructed the jury "to disregard any reference to [trial counsel's] relationship with Mr. Trejo." Appellant's motion for mistrial was denied. In the other instance, another witness's somewhat nonresponsive answer strongly implied that some of the adult caregivers that briefly lived in the Trejo home to help Barbara with the children did not stay because appellant made improper physical advances to them. Again, an immediate objection was sustained, and the trial court instructed the jury to disregard the witness's response. Appellant's mistrial motion was denied.
We review a trial court's ruling on a motion for mistrial for an abuse of discretion. In re J.A., 109 S.W.3d 869, 874 (Tex.App.-Dallas 2003, no pet. h.). In the absence of evidence to the contrary, we presume the jury followed the trial court's instructions. Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex.1982); In re J.A., 109 S.W.3d at 874. In light of the entire record and all of the evidence properly placed before the jury, the remarks in question were not so inflammatory or prejudicial that the trial court's curative instructions could be said to be of no effect. Issues eight and nine are overruled. The trial court's order of termination is affirmed.
AFFIRMED.
NOTES
[1] Unless otherwise designated, our use of the term "Department" will also include personnel employed by Programs for Human Services, that contracts with the Texas Department of Protective and Regulatory Services to provide continuing services to families where there has been a validated finding of abuse or neglect of children by Texas Department of Protective and Regulatory Services personnel.
[2] The children subject to the termination proceeding are S.T., male, born November 2, 1995; O.T.H., male, born November 13, 1996; G.T.H., female, born June 9, 1998; and M.L.T., female, born January 3, 2002.
[3] Although no medical evidence was introduced, it was not disputed that Barbara had suffered a stroke during the birth of her third child, G.T.H., on June 9, 1998.
[4] Barbara's father, James Fontenot, had agreed to remain in the home with the children at all times that appellant was not present in the home.
[5] Section 161.001(1)(E) includes alternate facts for termination and theoretically raises the same issue as 161.001(1)(D) in M.L.T.'s case. But to insist on a granulated submission of each possible statutory "fact" finding, breaking out direct and indirect acts, or conceivably "emotional" and "physical" well-being of the child, would run contrary to E.B.'s support for broad-form submission. The instruction here tracked the statute accurately, and we believe properly informed the jury of the essential facts required to be proven to answer the termination question affirmatively. See, generally, John J. Sampson, TDHS. v. E.B., The Coup de Græce for Special Issues, 23 St. Mary's L.J. 221 (1991).