NO. 07-05-0230-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



MAY 19, 2006


 ______________________________



IN THE INTEREST OF A. C. B., O. B. B.,



O. C. B. AND O. D. B., CHILDREN


_________________________________



FROM THE COUNTY COURT AT LAW OF RANDALL COUNTY;



NO. L-3535; HONORABLE JAMES W. ANDERSON, JUDGE


_______________________________




Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

OPINION


 Tamara Bailey challenges a final order terminating her parental rights to each of her
four children. Citing her compliance with the service plan established by the Department
of Family and Protective Services, she challenges the sufficiency of the evidence
supporting the trial court's order. We affirm.

 The four children of Tamara and Owen Chad Bailey (1) were born between early 1999
and the summer of 2002. The oldest is their daughter, A.C.B. The other three children are 
their sons, O.B.B., O.C.B., and O.D.B.. A caseworker from the Department of Family and
Protective Services investigating a complaint of neglect in January 2003 found the Baileys'
home to be unsanitary and unsafe for the children. The Baileys and the Department
agreed on a plan that provided the children would stay with Tamara's mother who lived
nearby while they cleaned the house to make it safe for the children. Tamara also
completed a parenting class. The Department closed the case without taking further
action.

 The Department received a second report of neglect in October 2003. A
caseworker found conditions in the house had not improved at all. The floor was covered
in trash including dirty diapers, feces was smeared on some walls, dirty dishes and old
food were throughout the house and the bathtub was unuseable. The children who
attended school were often dirty, and smelled of urine. The children were again sent to
stay with their grandmother while the house was cleaned. The children were removed in
December 2003 after caseworker Katie Klaehn visited and found many of the same
conditions persisted. The children were placed with a foster mother temporarily.

 The Department shortly filed pleadings, supported by the affidavit of Klaehn setting
out the circumstances prompting removal of the children. The petition sought relief that
included termination of the parental rights of both parents. As grounds for termination the
petition alleged the parents knowingly placed or allowed the children to remain in
conditions which endangered their physical or emotional well-being and engaged in
conduct which endangered their physical or emotional well-being. See Tex. Fam. Code
Ann. §161.001(1)(D), (E) (Vernon Supp. 2005). 

 On December 15, 2003, the trial court signed an agreed temporary order naming
the Department temporary managing conservator and imposing several conditions on the
parents. The conditions required the parents to undergo psychological and psychiatric
evaluations, participate in counseling, complete parenting classes, participate in marriage
counseling, and participate in the "Fly routine" designed to maintain safe and sanitary
conditions in their home. The temporary order also required the parents to comply with the
original or any amended service plan established by the Department. The Baileys signed
the original service plan on December 18, 2003. See Tex. Fam. Code Ann. § 263.103
(Vernon 2002). 

 During a January 2004 visit, caseworker Klaehn found the house was still in very
poor condition and the utilities had been disconnected. In February caseworker Amy
Hogan found improvement in the house but determined there were still significant
problems, including a general lack of cleanliness. By the summer of 2004, the third
caseworker, Pam Pollard, found significant improvement in the condition of the home, but
was not satisfied it had become a safe environment for the children. During this time
Tamara completed a parenting class and participated in some counseling. An amended
service plan signed by the Baileys August 3, 2004 stated the long-range goal as family
reunification by December 2004. A third plan, dated August 11, 2004, not signed by the
Baileys, listed the long-range goal as "unrelated, adoption." In September 2004 Chad
committed suicide. 

 A fourth caseworker was assigned and the trial court conducted the third
permanency hearing in the case in November 2004. The order from that hearing recited
the court's finding that Tamara had "not demonstrated adequate and appropriate
compliance with the service plan." The foster mother with whom the children had been
placed intervened in the suit in February 2005 seeking appointment as sole managing
conservator. 

 The case was tried to the bench over four days in May and June 2005. Witnesses
included Department caseworkers, counselors and medical experts, Tamara Bailey, her
sister-in-law and mother-in-law. The trial court ordered Tamara's parental rights
terminated, finding the Department established by clear and convincing evidence both
grounds alleged in the petition and that termination was in the best interest of the children. 
The order named the Department permanent managing conservator of each child. 

 Tamara's single appellate issue challenges the factual sufficiency of the evidence
supporting termination. The substance of her argument is that the trial court erred by
terminating her parental rights based on the facts and circumstances existing at the time
the children were removed rather than those obtained at the time of trial. She does not
contend the evidence of conditions in December 2003 was insufficient to support
termination. Citing only Family Code section 263.101, Tamara argues the Family Code
allows her a reasonable period to provide a safe environment for the children. She further
argues, without citation to supporting authority, that her success in complying with the
service plan is critical to the decision to terminate her parental rights. A substantial part
of the trial was devoted to evidence seeking to establish Tamara's compliance or non-compliance with specific elements of the service plan. 

 Section 161.001 authorizes termination of parental rights on proof of two elements
by clear and convincing evidence; first, that the parent committed any of the enumerated
acts or omissions, and second, that termination is in the best interest of the child. Tex. 
Fam. Code Ann. §161.001 (Vernon Supp. 2005); In re S.A.P., 169 S.W.3d 685, 695
(Tex.App.-Waco 2005, no pet.); In re S.M.L.D., 150 S.W.3d 754, 756 (Tex.App.-Amarillo
2004, no pet.). Nothing in the language of Chapter 161 imposes on the Department a
burden to establish non-compliance with a service plan under Chapter 263 (2) or suggests
that compliance with a service plan prevents an affirmative finding on either element. 

 Case law indicates a parent's compliance with a service plan does not preclude a
finding that termination is in the child's best interest. In In re M.G.D., 108 S.W.3d 508
(Tex.App.-Houston [14th Dist.] 2003, no pet.), the court found that a parent's "recent
turnaround" and compliance with a service plan are factors jurors should consider in a
determination of best interest, but are not determinative. Id. at 515. See also In re J.W.,
No. 10-03-040-CV, 2003 WL 22023977 (Tex.App.-Waco August 27, 2003, no pet.) (mem.
op.) (citing and quoting In re M.G.D., 108 S.W.3d at 515); In re S.A.W., 131 S.W.3d 704,
709 (Tex.App.-Dallas 2004, no pet.) (termination in best interest despite mother's lifestyle
improvements and eventual compliance with service plan). But see In re W.C., 98 S.W.3d
753, 766 (Tex.App.-Fort Worth 2003, no pet.) (finding evidence termination was in best
interest factually insufficient, citing, inter alia, uncontradicted evidence mother "has done
everything the Department required of her"); In re K.C.M., 4 S.W.3d 392, 399
(Tex.App.-Houston [1st Dist.] 1999, pet. denied), overruled in part on other grounds, In re
C.H., 89 S.W.3d 17 (Tex. 2002) (finding evidence supported contention that "jail turned
[mother's] life around" and rendered evidence that termination was in best interest factually
insufficient). 

 With their focus on Tamara's performance under the service plan, the parties have
not provided us a discussion of the Holley factors typically applied to a determination of the
best interest of children in termination proceedings. Holley v. Adams, 544 S.W.2d 367
(Tex. 1976). That non-exclusive list of factors includes the desires of the child; the
emotional and physical needs of the child now and in the future; the emotional and physical
danger to the child now and in the future; the parental abilities of the individuals seeking
custody; the programs available to assist these individuals to promote the best interest of
the child; the plans for the child by these individuals or by the agency seeking custody; the
stability of the home or proposed placement; the acts or omissions of the parent which may
indicate that the existing parent-child relationship is not a proper one; and any excuse for
the acts or omissions of the parent. Id. at 372. The best interest analysis evaluates the
best interest of the child, not that of the parent. In re S.A.P., 169 S.W.3d at 707. A
parent's performance under a service plan is likely to be relevant to several of the factors
stated in Holley, and therefore relevant to the best interest element of section 161.001. 
Because these are only factors to be considered in determining best interest of the child,
we cannot agree with Tamara's view that evidence she eventually substantially complied (3)
with a service plan prevents termination of her parental rights. In re M.G.D., 108 S.W.3d
at 514.

 Turning to consideration of the merits of Tamara's evidentiary sufficiency
challenges, we note that both elements required to support termination of parental rights
are matters of fact subject to review under legal and factual sufficiency standards. In re 
C.H., 89 S.W.3d 17 (Tex. 2002). Because those elements must be established by clear
and convincing evidence, our factual sufficiency review looks at the evidence to determine
if the trier of fact could reasonably form a firm belief or conviction about the truth of the
allegations. Id. at 25. 

 The evidence concerning the conditions of the home in December 2003 is sufficient
to support a firm conviction or belief that Tamara exposed the children to unsanitary
conditions in their home which endangered their well-being. That evidence showed that
dirty diapers were mingled among other trash and clothing on the floor, there was feces on
the walls, and the children and their clothing were often dirty and smelled of urine. (4) The
evidence showed these conditions were persistent and not isolated events. See In re
S.M.L.D., 150 S.W.3d at 758 (isolated events will ordinarily not establish a ground for
termination). Evidence that Tamara later cleaned the house and made it physically safe
for the children does not controvert the evidence that she had exposed the children to
conditions which endangered their well-being. The trial court's finding Tamara knowingly
allowed the children to remain in endangering conditions is supported by factually sufficient
evidence. 

 With respect to the best interest element, the Department (5) cites In re S.T., 127
S.W.3d 371 (Tex.App.-Beaumont 2004, no pet.), which focused its discussion of best
interest on three of the factors from Holley. 127 S.W.3d at 379. The Department also
relies on the opinions of several witnesses that termination of Tamara's rights was in the
best interest of the children. (6) The testimony was not limited to the witnesses' conclusions
concerning best interest, however. Several witnesses recited specific events, needs of the
children or deficiencies in Tamara's ability to care for the children on which their opinions
were based. That testimony went directly to the factors relevant to the trial court's
determination of the best interest of the children. 

 Evidence of the needs of the children showed all four are being medicated for
seizure disorder. In addition, A.C.D. suffers from a cerebral palsy-like condition affecting
her speech and gait. More than one witness testified to the children's need for a structured
home life to assure their consistent receipt of medication, and testified to the risks to their
health of a return to the care of a parent unable to meet their special needs. 

 With regard to Tamara's parental abilities, many of the witnesses who testified 
termination would be in the best interest of the children emphasized Tamara's failure to
take advantage of resources and programs made available to her. Those included help
offered from family members and the various programs to which she was referred by the
Department. It also included evidence that much of the difficulty Tamara faced was related
to clinical depression which she failed to manage effectively by following the treatment
prescribed. The limited evidence concerning the effect of Chad's absence if the children
were returned to Tamara included the testimony of Tamara's psychiatrist Dr. Ruben
Mendoza that the absence of another parent to assist with the children increased Tamara's
risk of depression. He further opined that a person suffering from depression is less likely
to be able to care for herself or others. Psychologist Edwin Basham had evaluated
Tamara for the Department and testified that even if she effectively managed her
depression, other personality problems interfered with her ability to care for the children. 
This included her dependance on Chad and inability to make independent decisions in the
best interest of the children. He found it likely that Tamara's pattern of "collapsing" and
becoming unable to function when problems arose would repeat, rendering her unable to
care for the children. 

 The three boys have lived with a foster mother since their removal from the Baileys'
home. The evidence they have thrived in her care was undisputed. The foster mother
testified to her desire to adopt all four children. There also was testimony from which the
court could have concluded the children were not strongly bonded with Tamara. 

 Tamara argues her one-hour visits with the children at the Department office
allowed her no opportunity to demonstrate her ability to provide a safe environment for
them. She emphasizes the evidence that, by the time of trial, she was maintaining stable
employment and housing, keeping her home clean, paying child support, visiting her
children and properly taking medication to keep her depression under control. Evidence
showed Tamara had been employed at the same job for about a year by the time of trial. 
Her work supervisor testified to her dependability. Despite this evidence, considering the
entire record, we conclude the trial court reasonably could form a firm belief or conviction
that termination of Tamara's parental rights was in the children's best interest.

 There is a strong presumption that the best interest of children is served by
preserving the parent-child relationship. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.
1976). Considered together with evidence of the children's favorable progress after
removal and the stability of the Department's proposed placement and viewed against the
factors identified in Holley, however, we find the evidence factually sufficient to support the
trial court's finding that termination was in the best interest of the children. We overrule
appellant's sole issue and affirm the judgment of the trial court.


 James T. Campbell

 Justice



1. The record indicates Mr. Bailey ordinarily used his middle name, and we use it
here.
2. This case does not present a circumstance in which a ground for termination is the
parent's failure to comply with a court order based on a service plan. See Tex. Fam. Code
Ann. § 161.001(1)(O) (Vernon Supp. 2005). 
3. Too, unlike the appellant in In re W.C., 98 S.W.3d at 766, the evidence of
Tamara's compliance with the service plans was not uncontradicted. 
4. Testimony from school personnel also indicated the older children were not
properly fed.
5. The children's attorney and guardian ad litem has adopted the Department's brief
on appeal.
6. The Department also challenges Tamara's credibility. As one example, the
Department cites her trial testimony in which she asserted that, before the children's
removal, she and the children actually lived with her mother across the street from the
marital home, and it was only by coincidence that Department representatives found her
and the children at that residence. This assertion was contradicted by the presence of
many dirty diapers and other indications the children resided in the marital home, and by
statements of Tamara's mother and others.


AN>Id. In other words, "comparable"
establishes a greater range of likeness or similarity than that implicit in "identical." See
Southwest Bell Tel. Co. v. Ramsey, 542 S.W.2d 466, 476 (Tex. Civ. App.-Tyler 1976, writ
ref'd n.r.e.) (remarking that the term "comparable" established a "vague standard"). So,
given that Republic opted to use "comparable" when specifying the extent of its monetary
liability under §G(3)(e)(2)(a), we hold it appropriate to assess its performance under
§G(3)(e)(2)(a) by the greater range of choice inherent in that word. (5) See Great Texas Cty
Mut. Ins. Co. v. Lewis, 979 S.W.2d 72, 74 (Tex. App.-Austin 1998, no pet.) (involving auto
insurance and stating that the "qualifying words 'of like kind and quality' permit but do not
require an engine of similar age, use, condition or . . . value"). 

 Next, Mex-Tex alleged that Republic breached its contractual obligation because
the former replaced the damaged roof with a comparable one, and the latter refused to pay
for it. To support its contention, evidence was offered illustrating that both the old and new
roof were "EPDM" roofing systems and that though they were "basically the same," they
differed in the manner by which they were affixed to the top of the building. For instance,
both consisted of the installation of an inch of insulation, a 45-millimeter membrane,
flashing, drainage crickets, and roof scuppers. However, while the membrane of the old
roof was affixed by rock and the force of gravity kept it on the top of the building, the new
roof was mechanically fastened to the building. Furthermore, installation of the new roof
did not require removal of the old. Instead, the ballast or rock was removed and the new
membrane was placed atop the existing. And, though the cost of the mechanically
fastened system was "a little higher" than "your [rock] ballast system," according to the
roofing contractor who testified, the labor incident to installing it "is less." This led the
witness to opine that "[t]hey generally come out pretty close to the same" and "one roof to
the other is comparable." 

 Next, the difference in price, according to the same witness, was attributable to the
"time of getting it done" and the cost of the insulation separator. (6) However, the estimate
tendered into evidence and describing the installation of the $179,000 roof does not
distinguish between the amount of money attributable to each. Nonetheless, the insurance
policy imposed on Mex-Tex the duty to "[t]ake all reasonable steps to protect the Covered
Property from further damage by a Covered Cause of Loss" and to undertake "the repairs
or replacement . . . as soon as reasonably possible after the loss or damage" as a
condition of being paid. These provisions, coupled with the fact that its tenants suffered
damage from rain seeping through the defective roof and would continue to so suffer,
provided Mex-Tex with both contractual and practical basis for acting while Republic
debated what to do. And, upon Mex-Tex requesting payment for the "comparable" roof,
Republic refused. 

 Thus, we have before us some evidence illustrating that the damaged property was
replaced by property of "comparable material and quality," i.e. by similar property. So too
do we find of record evidence that Republic failed to pay the cost of the replacement. In
short, we have sufficient evidence before us to support the trial court's finding of a
breached contract. 

 Nevertheless, Republic would have us hold otherwise because it purportedly agreed
to pay for a roofing system "identical" to that replaced, i.e. one ballasted by rock not
mechanically fastened to the building. Admittedly, this evidence would be of import if
Republic's liability were controlled by the word "identical." Yet, as we have previously
discussed, it is not. Again, the insurer defined the scope of its liability through the use of
words providing greater leeway or choice in the type of property which could be used to
replace that which was damaged. Thus, its duty was not to simply pay for an identical roof. 
Rather, it committed, pursuant to §§E(4)(a)(4) and G(3)(e)(2)(a), to pay for a comparable
one. While an identical roof may fall within the scope of a comparable roof, the scope of
comparable is not dictated by the meaning of identical. Southwest Bell Tel. Co. v. Ramsey,
542 S.W.2d at 476 (involving evidence of comparable sales). And, since there exists some
evidence illustrating that while the roof installed by Mex-Tex may not have been the same
or identical to that replaced, it was nonetheless comparable. So, Republic was duty bound
to pay for it. 

 In sum, if an insurer cares to limit its exposure it can write a contract that expressly
does so. Here, that could have easily been done by modifying the phrases "like kind and
quality" and "comparable material and quality." Instead of using them as written, it could
have stated that if available, identical property had to be used to replace the damaged
item, otherwise comparable property could be used. Or, some similar, though not identical,
phraseology could have been adopted. But, it did not, and it was not. Words of a less
definitive nature twice were used, and those words make it possible to both restrict or
broaden its liability depending upon the circumstances of the case. And, having included
them in the contract, it is bound by them. Again, the Texas Supreme Court requires us to
enforce the contract as written. State Farm Fire & Cas. Co. v. Reed, supra. Again, it
obligates us to give those words their "plain, grammatical meaning unless doing so would
clearly defeat the intentions of the parties." Anadarko Petroleum Co. v. Thompson, 94
S.W.3d 550, 554 (Tex. 2002). And, we do not believe that our construction of the policy
at bar "clearly defeat[s] the intentions of the parties" when Republic itself explains, in its
brief, why leeway is needed. As previously said, one should say what they mean and
mean what they say. 




Issues Two and Three - Extra Expense and Mitigation Cost


 In its second and third issues, Republic contends that the difference in cost between
the price of an identical roof and the one actually installed could not be justified as an extra
expense or an expense related to the cost of mitigating damage. Given our disposition of
issue one, we need not address these issues. 

 In short, Republic was obligated to pay for a roof of comparable material and quality. 
The trial court found that the roof Mex-Tex installed fell within that scope. Therefore,
Republic was duty bound to pay for it. So, whether the cost difference was justifiable as
an extra expense or an expense incident to mitigation (when the policy itself obligated Mex-Tex to mitigate damage and act as quickly as reasonably possible) matters not, and we
overrule Republic's second and third issues. 

Issue Six - Violation of Art. 21.55 of the Insurance Code


 Next, Republic argues the trial court erred when it found that art. 21.55 of the Texas
Insurance Code was violated. This is allegedly so because it complied with the time
periods mandated by the statute, and Mex-Tex's claim was invalid, i.e. it did not seek
payment for a comparable roof. Construing the issue to be an attack upon the sufficiency
of the evidence underlying the finding, we overrule it.

 Standard of Review

 The applicable standard of review was discussed under issue one. We refer the
parties to it.

 Application of Standard

 Article 21.55 of the Insurance Code establishes deadlines by which an insurer must
act to avoid the imposition of statutory penalties. For instance, an insurer is obligated
thereunder to notify the insured of its decision to accept or reject a claim no later than 15
business days after receiving "all items, statements, and forms required by the insurer." 
Tex. Ins. Code Ann. art. 21.55 §3(a) (Vernon Supp. 2003). If the insurer then decides that
the claim will be paid, it must do so within five business days. Id. at art. 21.55, §4. 
Similarly, §3(f) of the article also establishes a pertinent time period. It states that "if an
insurer delays payment of a claim following its receipt of all items, statements, and forms
reasonably requested and required . . . for more than 60 days, the insurer shall pay
damages and other items as provided for in Section 6 of this article." Tex. Ins. Code Ann.
art. 21.55, §3(f). With this said, we turn to the arguments proffered by Republic.

 As to the contention that art. 21.55 was inapplicable because Mex-Tex lacked a
valid claim, we refer the parties to our discussion and conclusion under issue one. There
exists evidence of record supporting the trial court's decision that it had a valid claim which
went unpaid. Thus, Republic is mistaken in suggesting that art. 21.55 is inapplicable for
the reason stated. 

 Next, to the extent Republic argues that it complied with each provision, we again
note that it failed to pay the claim of $179,000. Since it did not, it breached the terms of
the insurance policy. Having done that, it also violated §3(f) of art. 21.55. Cater v. United
Serv. Auto. Ass'n, 27 S.W.3d 81, 84 (Tex. App.-San Antonio 2000, pet. denied), quoting
Higginbotham v. State Farm Mut. Auto. Ins. Co., 103 F.3d 456 (5th Cir. 1997); Oram v.
State Farm Lloyds, 977 S.W.2d 163, 167 (Tex. App.-Austin 1998, no pet.). (7) 

 Simply put, Mex-Tex averred that Republic "delayed payment of [its] claim . . . in
violation of Article 21.55 . . . ." Since Republic did not ever pay the claim, there appears
of record some evidence that supports the finding of liability under art. 21.55. Thus, we
cannot say that the trial court erred in so adjudging. 

Issues Four and Five - Good Faith and Full Settlement via Partial Payment


 In issues four and five, Republic argues that the trial court erred in finding that it
acted in bad faith and in improperly attempting to enforce a full release of a claim by
making only a partial payment. The import of these findings is questionable. Though the
trial court found that Republic acted in bad faith and attempted to so obtain a full release
of the claim, it did not expressly find that those acts caused Mex-Tex any damage. Nor did
it use them as basis for awarding any damages or any other recovery against Republic. (8) 
Moreover, the latter has not explained how it was harmed by the findings or how our
consideration of issues four and five will in any way affect its liability to Mex-Tex, given the
absence of any concomitant findings of damage.

 We recognize our obligation to address each issue raised and necessary to a final
disposition of the appeal. Tex. R. App. P. 47.1; Texas Disposal Sys., Inc. v. Perez, 80
S.W.3d 593, 594 (Tex. 2002). Yet, having rejected Republic's attack upon issues one and
six (which involved the only choses-in-action upon which the judgment is founded), we do
not see how either sustaining or overruling issues four and five would alter the trial court's
judgment or affect the finality of ours. Consequently, they are not necessary to the final
disposition of the appeal, and we will not consider them. 

Issue Seven - Calculation of Penalty


 Next, Republic argues that the trial court erred in awarding Mex-Tex $35,223.51 as
a penalty for violating art. 21.55. This is supposedly error because its calculation failed to
consider Republic's tender of the cost for replacing the roof with an identical one, i.e.
$145,000, in August of 1999. Thus, the penalty should be calculated only upon the
difference between the amount tendered and the amount awarded by the trial court for
breach of contract, according to the insurer. We overrule the issue for several reasons.

 First, Republic cites no authority in support of its contentions. Same was required
by Texas Rule of Appellate Procedure 38.1(h). Having failed to abide by that rule, it
waived the contention. In re Williams, 998 S.W.2d 724, 730 (Tex. App.-Amarillo 1999, no
pet.). 

 Second, §6 of art. 21.55 states that "[i]n all cases where a claim is made pursuant
to a policy . . . and the insurer liable therefor is not in compliance with the requirements of
this article, such insurer shall be liable to pay the holder of the policy . . . 18 percent of the
amount of such claim, together with reasonable attorney's fees." Tex. Ins. Code Ann. art.
21.55, §6 (emphasis added). As can be seen, in specifying the amount upon which the
18% penalty is to be calculated, the legislature expressly referred the amount of the
"claim." Here, the "claim" submitted by Mex-Tex was for $179,000, not the difference
between $179,000 and $145,000. Thus, to use some number other than the actual
amount of the "claim" in calculating the penalty would be to ignore the words of the statute;
that we cannot do. Spradlin v. Jim Walter Homes, Inc., 34 S.W.3d 578, 580 (Tex. 2000).

 Third, and assuming arguendo that the effect a tender of payment has upon the
accrual of interest is the same as that on the accrual of a penalty (which we believe
Republic to be suggesting), the amount tendered must be that actually owed. Bray v.
Cadle Co., 880 S.W.2d 813, 818 (Tex. App.-Houston [14th Dist.] 1994, writ denied). Since
the tender of a lesser amount does not toll the accrual of interest, Hoxie Implement Co. v.
Baker, 65 S.W.3d 140, 156 (Tex. App.-Amarillo 2001, pet. denied), logic dictates that it
has the same effect (or lack thereof) on the accrual of a penalty. Consequently, Republic
was obligated to tender the entire $179,000 sum, and because it did not, the offer to simply
pay $145,000 did not prevent the penalty from accruing on the entire amount owed. 

Issue Eight - Prejudgment Interest


 In its final point of error, Republic contends that the trial court erred in awarding
Mex-Tex the amount of prejudgment interest it awarded. We overrule the issue for the
following reasons.

 First, it argues that the sum upon which the interest should have been calculated
was the difference between the amount it tendered in August of 1999 ($145,000) and the
amount of the claim ($179,000). However, as discussed under issue seven, tender of less
than the amount owed does not stop interest from accruing. Hoxie Implement Co. v.
Baker, supra. Since Republic tendered less than the entire $179,000, the prejudgment
interest did not stop accruing on the entire sum due.

 Next, the contention that §304.105 of the Texas Finance Code effectively stopped
the accrual of interest during the period in which Mex-Tex had to accept the $145,000 is
misplaced. Republic concedes that it never asserted this before the trial court. Having
failed in that respect, it also failed to preserve it for review. Haley v. GPM Gas, Corp., 80
S.W.3d 114, 119-20 (Tex. App.-Amarillo 2002, no pet.); Tex. R. App. P. 33.1(a)(1). Yet,
even if it had been preserved, we see that §304.105 applies only to suits for wrongful
death, personal injury, and property damage. Tex. Fin. Code Ann. §304.101 (Vernon
Supp. 2003). A suit against an insurer for breaching its contract with its insured (like that
at bar) does not fall within any of those categories. Head Indus. Coatings & Serv., Inc. v.
Maryland Insurance Co., 981 S.W.2d 305, 311 (Tex. App.-Texarkana 1998, pet. denied). 
Thus, the provision has no application at bar.

 We affirm the judgment of the trial court.


 Brian Quinn

 Justice



1. Though damages were awarded, it does not appear that the sum included an amount to recompense
the corporation for its purported mental anguish. However, Mex-Tex does not complain about that on appeal. 

2. Evidence indicates that the difference in cost was attributable to the speed with which the roof was
installed (the contractor apparently made it a priority item and charged for doing so) and the cost of an
insulation separator.
3. No one contends that any part of the insurance contract at bar is ambiguous. Nor do we find it so.
4. In Black's Law Dictionary, it is defined as "equal in quantity, quality, or degree," "corresponding
exactly," or "similar or substantially similar." Black's Law Dictionary (1999).
5. To the extent Republic incorporated a word into the policy which established a somewhat vague
standard or range of liability, our duty is to interpret the word in a manner favoring the insured, i.e. Mex-Tex. 
Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984). Our construction of "like" and "comparable"
does that.
6. Moreover, the actual roof contractor testified that the replacement roof was of "like, kind and quality"
as the previous roof.
7. More importantly, whether the insurer acted in good or bad faith matters not. Cater v. United Serv.
Auto. Ass'n, 27 S.W.3d 81, 84 (Tex. App.-San Antonio 2000, pet. denied).
8. The damages at bar were awarded solely for breached contract and violation of art. 21.55 of the
Insurance Code.